[No. 1625.]

## MAJOR POWELL *v.* THE STATE.

1. THEFT—ACCOMPLICE TESTIMONY.—A conviction for theft had upon the testimony of an accomplice or *particeps criminis* cannot stand, unless such accomplice has been corroborated in some material matter connecting the defendant with the taking or the alleged stolen property.
2. SAME—EVIDENCE.—See evidence *held* to be insufficient to support a conviction for theft, inasmuch as there is a total want of corroboration of the accomplice witness, on whose testimony the conviction was obtained.

APPEAL from the District Court of Jackson. Tried below before the Hon. W. H. Burkhart.

The indictment in this case charged the appellant with the theft of a cow, the property of one William LaBauve, in Jackson county, on the twelfth day of February, 1883. The penalty affixed, by a verdict of guilty, was a term of three years in the penitentiary.

Henry Chinn, a colored man, was the first witness for the State. He testified that one evening, when the sun was about an hour high, and while he was at his home, the defendant came to him and requested him to go with him and assist him in dressing a beef which he had killed, proposing to reward the witness by giving him a part of the meat. The witness went with him to a point about one hundred yards from his, the defendant's, house, and found a red cow lying dead. She had been shot just behind the left fore leg. She was branded JLL, the J and L connected, and she was the property of Willie LaBauve. LaBauve had never given either the witness or the defendant permission to take or to kill any of his cattle. Witness assisted the defendant in skinning the cow. They threw the head, feet, and the leg bones, in a gully near by. After quartering the animal, the witness took one fore and one hind quarter home and pickled it down. The defendant took the rest of the beef home with him. The cow was very fat, and made splendid beef.

The witness and the defendant have known each other for a

long time, and have been closely associated for many years. They had been partners. The cow was skinned on a Saturday evening in December, sometime during the Christmas holidays. On the Monday following, the witness was at the house of the defendant, and there saw the hide of this identical animal, spread out on the ground behind the defendant's house. Witness was positive that it was the hide they took from LaBauve's cow on the Saturday before.

While the witness was at the defendant's house on this occasion, Mr. L. Ward and Mr. Maxwell came there and examined hides. They found two hides; one branded L, which belonged to Mr. L. Ward, and a red hide branded JLI, the JL connected, which belonged to Willie LaBauve, and which was the same taken from the cow described, by the witness and defendant on the Saturday previous. Mr. Ward asked about the hide branded L, and the defendant told him that the witness brought it to him a few days before, to stretch. Mr. Ward said: "Well, I will charge you both with it, and I reckon I will get the right one." The L hide had a bullet hole in it.

The defendant's house is in Ward's pasture. He, defendant, owns a little patch of land there. The cow was killed in Ward's pasture. Witness and the defendant stole the LaBauve cow, but the witness did not see the defendant shoot her. After the visit of Ward and Maxwell to the defendant's house, witness and defendant sold the hide and divided the money. Ed. Powell, brother of the defendant, was at the defendant's house at the time the slain cow was dressed, but took no part in the work, nor did he go with witness and defendant to the carcass; but, after that work had been done by witness and defendant, he, Ed. Powell, was sent after the tallow. He was in attendance upon court as a witness, and was under the rule. Defendant and witness finished butchering the cow about dark. The cow did not die of starvation. She was quite fat, and made good beef.

Witness went to Mr. Ward about two months before this trial, and told him that the defendant did not kill his, Ward's cow— the one branded L, but that he, witness, killed that animal himself. This was after the defendant had been indicted for the theft of that cow, and witness had been summoned as a witness in that case. That indictment was found at the last term of the court. At the same time witness told Ward that the defendant did kill the LaBauve cow. The reason witness went to Ward and told him was that he, witness, had got religion since the last

term of court, and God, who had blessed his soul, sent him to tell Ward.

Cross-examined, the witness stated that the feet, head and leg bones were the only part of the carcass they threw into the gully near which the cow was killed. Witness went twice to see Ward. The first time was about three weeks after he got religion. Witness's brother Nelson went with him. God had not yet condemned him about L. Ward's cow. Witness swore to a lie in the grand jury room at the July term of court, when he swore that he knew nothing about defendant killing Ward's cow, and that he knew nothing about defendant killing any other animals. This was before the witness got religion. On this, the witness's first visit to Ward, he asked Ward why he had had him, witness, summoned in that case, that he knew nothing about it. Ward replied: "I suppose the State had you summoned; all you have to do in the matter is to tell just what you know about it." Witness again told Ward that he knew nothing about the defendant killing that or any other animal. Witness's brother persuaded him on this occasion not to tell Ward that he, witness, had killed the L cow.

Subsequent to this time, witness saw God face to face with the Eye of Faith, and talked with Him, and He condemned the witness about the cow, and about the lie he had told Ward about the cow. But He did not condemn the witness for the other animals he had killed. Witness thought that the law could take his body for crime, but he knew that Jesus had his soul. He knew that he had committed a crime and must be punished. Witness was now under indictment for stealing Ward's cow, and was willing to be punished for it.

After God condemned the witness about the theft of Ward's cow, and about the lie he had told Ward concerning the matter, He told witness that he must go to Ward and confess. Accordingly, about a week after the first visit, the witness got up early one morning and went to Ward's house. Ward was then at breakfast. Witness told him that God had condemned him, witness, about the theft of the cow and the lies he told about it, and that he had come to tell him that the defendant did not, but that he, witness, did kill the L cow—that the defendant was not guilty of that offense. Ward then said to the witness: "Henry, you must be born again. No man would come up and confess his crime unless he was born again, and you shall not be hurt." These were the only two times witness went to see Ward about

the matter. When the defendant was put on trial for the theft of Ward's cow, the week before this trial, the witness took the stand, and told the jury that he had lied on the defendant in the grand jury room about the killing of Ward's cow—that defendant did not do it, but that he, witness, did.

When witness was first arrested on a bench warrant, Mr. Ward went on his recognizance. When he was indicted, Mr. Ward went on his bond. This was during the present term of court, and after the defendant's trial for the other theft. Ward also told witness that he would try to get the lightest punishment awarded witness, and would afterwards try to get him a pardon.

If the witness had not yet been indicted for perjury, he knew that he ought to be. Defendant did not, after he was indicted for the theft of Ward's cow, tell witness that he, witness, had killed that cow, and that he, defendant, was going to prove himself clear, knowing that witness killed that animal. Defendant was incapable of telling the truth—he fears for the body. Witness did not kill the LaBauve cow. God did not condemn the witness for killing any other cow than Mr. Ward's. Witness had not told about any other crimes he had committed and not yet brought to a contest, but he had confessed to God. Witness told the lie to the grand jury in July, because he wanted to protect the defendant. Witness and defendant had long been associates and companions. Defendant married the witness's niece.

L. Ward testified, for the State, that on or about February 12, 1883, he heard that his cattle up the creek were being killed, and he went up there to see about it. He went to the defendant's house and found Henry Chinn, the last witness, there. Defendant was not then present, but came presently. Mr. Maxwell was with the witness. Witness found one cow hide in the corner of a fence, rolled up. This hide had a bullet hole in it, and was branded L, the witness's brand. They found another hide on the premises, branded JLI, the JL connected. The witness did not remember the color. Witness saw no bullet hole in this hide. He noticed that it looked partly decayed, and that the hair was slipping in places. This hide was taken from an animal belonging to the JLI brand, which is the brand of Willie LaBauve. LaBauve has land in the witness's pasture, and his cattle run in that pasture. Defendant has a small tract of land in that pasture, and lives on it.

The witness found the L hide after some little search around the place.   When defendant came up witness asked him about that hide.   He first denied any knowledge of it whatever, but finally said that Henry Chinn brought it there and asked him to stretch it.   When asked about the hide of the LaBauve cow, the defendant said that he and another or others had skinned the cow.   The witness found the head, feet and leg bones of an animal that had been recently killed, in a gully near the defendant's house.   The backbone was near by, and looked as though the flesh had been recently cut from it.   The witness also found a carcass in the woods, about a hundred yards from the defendant's house.   This carcass was all together, and the defendant said that he had dragged it to that point, but the witness could find no evidence of a drag.   He saw the manure from the paunch about twenty steps distant from the gully.

Cross-examined, the witness stated that he did not see the La-Bauve hide when it was first found.   William Chinn was not at the defendant's house when the hides were examined.   Henry Chinn, the witness who testified in this case, came to see the witness three times about this matter, after the defendant was indicted for the theft of witness's cow.   That indictment was presented at the last term of court.   The first time he came, he declared that he knew nothing about it.   Within a week afterward he sent the witness word that he, Henry Chinn, killed the cow—the L cow.   Shortly thereafter, and early in the morning, he called on the witness, and the witness asked him if the vigilants were after him.   He said no, but that God was, and that he had come to tell the witness that he killed the witness's cow, and that the defendant did not.   Witness did not say to him that he must be born again, nor did he promise that he, Henry Chinn, should not be hurt.   Witness went on Henry Chinn's recognizance when he was arrested on a bench warrant, and on his bond after he was indicted.   Henry Chinn had no land in the witness's pasture.   Witness did not remember telling Chinn that he would try to get him a pardon in the event of his conviction, though he did say so to others.

C. C. Maxwell testified that he was with L. Ward when the JLI (LaBauve) red cow hide was found at defendant's house.   It was hanging on the fence, in full view of any one who might pass that way.   Witness did not notice that the hair on it was slipping.   It appeared to have been stripped from the animal some two or three days.

William LaBauve and O. De Leon LaBauve, sworn for the State, testified that the JLI (the first two letters connected) brand belonged to them and their mother, on and before the twelfth day of February, 1883, the date upon which the hide was found at defendant's place. Neither defendant nor Henry Chinn had permission to take that cow. It ran on the range in L. Ward's pasture. Here the State closed.

William Chinn testified, for the defense, that one evening in February, 1883, while he and Warren Powell were driving hogs out of the woods, above the defendant's place, they found a dead cow, of a brown-red color. She was branded JLI—the JL connected—on the left hip, and as the hair was slipping from the jaw, witness judged that she had been dead several days. Witness and Warren Powell drove the hogs on past the defendant's house, and seeing defendant near there told him about the dead cow. Defendant said, "all right; I will go and skin her." Witness and Warren drove the hogs on to witness's house, where they penned them, and defendant went on towards home. On the next morning the witness went to the defendant's house and saw a hide which he recognized as the one he saw on the dead cow spoken of the evening before. Witness lived within fifty yards of the defendant, and the two houses were in full view of each other. The hide found by L. Ward and others was the hide taken from the dead cow, of which the witness told the defendant.

Cross-examined, the witness testified that he and defendant were brothers-in-law. Henry Chinn was the witness's uncle. The dead cow spoken of by witness lay on her right side, and was branded JLI on the left hip. There were evidences about the body of the cow having struggled, the ground around showing where she had pawed after getting down. She had not been killed, but appeared to have perished of poverty. This corpse or carcass of the cow was found by the witness and Warren Powell about a week before Ward and others were at defendant's house. Witness was not there when Ward was, but went over immediately after Ward left.

Warren Powell, for the defense, corroborated the last witness as to the discovery of the body of the cow. They told defendant about it, and defendant said he would go and skin her. Witness never afterwards saw cow or hide.

The motion for new trial assailed the charge of the court as given, the action of the court in refusing charges asked, and

denounced the verdict as against the charge and as unsupported by law or evidence.

*A. B. Petticolas* and *J. D. Owen,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.   A careful consideration of every phase of the evidence elicited at the trial fails to satisfy us that the accomplice or *particeps criminis* who turned State's evidence has been corroborated in any material matter which goes to connect appellant with the taking of the animal for the theft of which he has been convicted.

Appellant may be guilty, as is testified by the witness, but the law requires more than such testimony to warrant a conviction, and without it is corroborated in some material matter we cannot sanction a conviction dependent alone upon it.

The judgment is reversed and the cause remanded because of insufficiency of the evidence.

*Reversed and remanded.*